## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KRYSTINA RUSSELL, on behalf of
herself and all others similarly
situated,

              Plaintiffs,

    v.

MIDLAND CREDIT MANAGEMENT,
INC. *et al.*,

              Defendants.

No. 20-cv-00618
Judge Franklin U. Valderrama

### MEMORANDUM OPINION AND ORDER

Plaintiff Krystina Russell (Russell) allegedly incurred a debt related to her use of a consumer credit card account with Credit One Bank, N.A. (Credit One). As a result, Midland Funding, LLC (Midland Funding), by its servicing agent, Midland Credit Management, Inc. (MCM), both assignees of Credit One, brought a state court action against Russell to collect on the debt. Kohn Law Firm S.C. (Kohn), a law firm, represented the assignees in the state court action. Russell then filed this individual and putative class action lawsuit against Midland Funding, MCM, Kohn, and Encore Capital Group, Inc., a debt collection financing company, (Encore) (collectively, Defendants). R. 1, Compl.[1] Russell alleges that Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*. (FDCPA) by filing a state court

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

complaint that misrepresented the amount and legal status of her alleged debt and by thereby using unfair practices to collect on the debt. In response, Defendants have filed the instant Motion to Compel Arbitration (R. 23, Mot. Compel), moving the Court to compel arbitration of Russell's claim. For the reasons set forth below, the Court grants the Motion to Compel Arbitration.

## Background

On or about March 27, 2015, Russell opened a consumer credit card account ending in 9932 with Credit One. R. 24-1, 2020 Harwood Affidavit ¶ 5.[2] The Card Agreement, attached to the 2020 Harwood Affidavit as Exhibit A, contains the following relevant provisions:

> This Agreement, together with the application you previously signed and the enclosed Arbitration Agreement, governs the use of your VISA or Mastercard Account issued by Credit One Bank, N.A. (the "Account," "Card" or "Card Account"). The words "you," "your" and "Cardholder(s)" refer to all persons, jointly and severally, authorized to use the Card Account; and "we," "us," "our," and "Credit One Bank" refer to Credit One Bank, N.A., its successors or assigns. By requesting and receiving, signing or using your Card, you agree…
>
> . . .
>
> **ARBITRATION AGREEMENT:** This Agreement is governed by and interpreted in accordance with the laws applicable to national banks, and, where no such laws apply, by the laws of the State of Nevada, excluding the conflicts of law provisions thereof, regardless of your state of residence.
>
> . . .
>
> **PLEASE READ THIS PROVISION OF YOUR CARD AGREEMENT CAREFULLY. IT PROVIDES THAT EITHER YOU OR WE CAN REQUIRE THAT ANY CONTROVERSY OR DISPUTE BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT**

---

[2]Gary Harwood (Harwood) is a Vice President, Collections and Authorized Representative of Credit One.

**TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT. IN ARBITRATION, YOU MAY CHOOSE TO HAVE A HEARING AND BE REPRESENTED BY COUNSEL.**

. . .

**Agreement to Arbitrate:** You and we agree that either you or we may, without the other's consent, require that any controversy or dispute between you and us (all of which are called "Claims"), be submitted to mandatory, binding arbitration. This arbitration provision is made pursuant to a transaction involving interstate commerce, and shall be governed by, and enforceable under, the Federal Arbitration Act (the "FAA"), 9 U.S.C. §1 et seq., and (to the extent State law is applicable), the State law governing this Agreement.

. . .

**Claims Covered:** Claims subject to arbitration include, but are not limited to, disputes relating to the establishment, terms, treatment, operation, handling, limitations on or termination of your account; any disclosures or other documents or communications relating to your account; any transactions or attempted transactions involving your account, whether authorized or not; billing, billing errors, credit reporting, the posting of transactions, payment or credits, or collections matters relating to your account; services or benefits programs relating to your account, whether or not they are offered, introduced, sold or provided by us; advertisements, promotions, or oral or written statements related to (or preceding the opening of) your account, goods or services financed under your account, or the terms of financing; the application, enforceability or interpretation of this Agreement, including this arbitration provision; and any other matters relating to your account, a prior related account or the resulting relationships between you and us. Any questions about what Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced.

. . .

Claims subject to arbitration include not only Claims made directly by you, but also Claims made by anyone connected with you or claiming through you, such

as a co-applicant or authorized user of your account, your agent, representative or heirs, or a trustee in bankruptcy. Similarly, Claims subject to arbitration include not only Claims that relate directly to us, a parent company, affiliated company, and any predecessors and successors (and the employees, officers and directors of all of these entities), but also Claims for which we may be directly or indirectly liable, even if we are not properly named at the time the Claim is made.

. . .

Claims subject to arbitration include Claims based on any theory of law, any contract, statute, regulation, ordinance, tort (including fraud or any intentional tort), common law, constitutional provision, respondeat superior, agency or other doctrine concerning liability for other persons, custom or course of dealing or any other legal or equitable ground (including any claim for injunctive or declaratory relief). Claims subject to arbitration include Claims based on any allegations of fact, including an alleged act, inaction, omission suppression, representation, statement, obligation, duty, right, condition, status or relationship.

. . .

Claims subject to arbitration include Claims that arose in the past, or arise in the present or future. Claims are subject to arbitration whether they are made independently or with other claims in proceedings involving you, us or others. Claims subject to arbitration include Claims that are made as counterclaims, cross- claims, third-party claims, interpleaders or otherwise, and a party who initiates a proceeding in court may elect arbitration with respect to any Claim(s) advanced in the lawsuit by any other party or parties. Claims subject to arbitration include Claims made as part of a class action or other representative action, and the arbitration of such Claims must proceed on an individual basis.

. . .

If you or we require arbitration of a particular Claim, neither you, we, nor any other person may pursue the Claim in any litigation, whether as a class action, private attorney general action, other representative action or otherwise.

. . .

**Severability, Survival:** This arbitration provision shall survive: (i) termination or changes in the Agreement, the account and the relationship between you and us concerning the account; (ii) the bankruptcy of any party;

4

and (iii) any transfer or assignment of your account, or any amounts owed on your account, to any other person . . .

2020 Harwood Affidavit, Exh. A (Card Agreement) at 2, 4, 6–7 (emphasis in original).

Russell allegedly incurred a debt for the purchase of consumer goods and services via use of her Credit One consumer credit card account (Alleged Debt). Compl. ¶ 27. The Alleged Debt is a "debt" as that term is defined in Section 1692a(5) of the FDCPA. *Id.* ¶ 28. She could not pay the debt, and it went into default. *Id.* ¶ 29. Through a series of assignments, Midland Funding ultimately ended up with rights to collect on the Alleged Debt. *Id.* ¶¶ 30–34. Kohn filed a lawsuit on Midland Funding and MCM's behalf in the Circuit Court of Cook County, Illinois as Case No. 19-M1-128216 to start collecting on the Alleged Debt (the State Court Case). *Id.* ¶ 35. The complaint[3] in the State Court Case (the State Court Complaint) and the summons in the State Court Case (the State Court Summons) conveyed information regarding the Alleged Debt, including the identity of the creditor and the outstanding balance. *Id.* ¶ 37.

According to Russell, the State Court Complaint and State Court Summons were each a "communication" as that term is defined in Section 1692(a) of the FDCPA. Compl. ¶ 38. As part of its relief in that suit, Midland Funding requests a judgment for $1,172.00 "as well as the costs of this action." *Id.* ¶ 39. The State Court Summons is silent as to costs. *Id.* ¶ 40. Attached to the State Court Complaint is a form "Credit

---

[3]The State Court Complaint asserted causes of action for breach of contract; implied contract/unjust enrichment; and account stated. R. 1-1 at CM/ECF 8–10, State Court Complaint.

Card or Debt Buyer Collection Affidavit" as required by Illinois Supreme Court Rule 280.2. *Id.* ¶¶ 41, 46. The Affidavit, signed by Melanie Rosenberger (Rosenberger), a Midland Funding employee (Rosenberger Affidavit), contains two boxes, a Yes and a No box, regarding additional amounts after the charge-off date. *Id.* ¶¶ 43–44, 47–48. The No box was checked off by Rosenberg, indicating that Midland Funding is not seeking additional amounts after the charge-off date. *Id.* ¶¶ 47–48.

Russell subsequently brought this action individually and as class action against Defendants, alleging that Defendants violated 15 U.S.C. § 1692e and 15 U.S.C. § 1692f of the FDCPA. Compl. Defendants filed the pending Motion to Compel Arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (FAA). Mot. Compel. Defendants argue that Russell cannot maintain her suit before the Court because she is subject to a Credit One credit card account agreement which (i) contains an arbitration provision that compels Russell to arbitrate any claims related to her credit card account and (ii) waives Russell's rights to seek class-wide relief. R. 24, Memo. Compel at 1.

### Standard of Review

The Federal Arbitration Act "reflects both a liberal federal policy favoring arbitration . . . and the fundamental principle that arbitration is a matter of contract." *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). Under the FAA, arbitration agreements "'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Janiga*

*v. Questar Cap. Corp.*, 615 F.3d 735, 740 (7th Cir. 2010) (quoting 9 U.S.C. § 2)). "Although it is often said that there is a federal policy in favor of arbitration, federal law places arbitration clauses on equal footing with other contracts, not above them." *Id*. "[A]rbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017).

The party seeking to compel arbitration has the burden of establishing an agreement to arbitrate. 9 U.S.C. § 4; *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). Once the party seeking to compel has established an agreement, the party resisting arbitration bears the burden of identifying a triable issue of fact on the purported arbitration agreement. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The resisting party's evidentiary burden is like that of a party opposing summary judgment. *Id*. "[A] party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id*. Like summary judgment, the court views the evidence in the light most favorable to the non-moving party and draws reasonable inferences in its favor. *Id*. If the party opposing arbitration identifies a genuine issue of fact as to whether an arbitration agreement was formed, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4; *see Tinder*, 305 F.3d at 735.

## Analysis

Defendants argue that Russell agreed to Credit One's Card Agreement when she opened and used her Credit One credit card to make purchases. Memo. Compel at 1–2. Defendants point out that the Card Agreement contains an arbitration provision mandating arbitration of Russell's claim and a waiver of class action relief. *Id.* at 2–4. They contend that the arbitration provision in the Card Agreement is valid and enforceable, that Russell's claim fall within the scope of the arbitration provision, and that Defendants are entitled to enforce the arbitration provision based on Midland Funding's status as an assignee of Credit One pursuant to the Card Agreement. *Id.* at 8–14. Lastly, Defendants maintain that Russell affirmatively waived her ability to proceed before the Court as a class representative or class member as a result of a class waiver provision in the Card Agreement. *Id.* at 14–15. As a result, Defendants ask the Court to compel arbitration of Russell's claims and dismiss her complaint. *Id.* at 15.

In response, Russell argues that the first (enforceable written agreement) and second (dispute is in scope) elements are not present, and therefore, arbitration should not be compelled here. As for the first element, Russell denies the existence of a valid written arbitration agreement. Russell contends that Defendants have failed to show that Midland Funding is the proper assignee of the Card Agreement, and as such, Defendants have failed to show that an agreement to arbitrate exists between Russell and Midland Funding. Russell further argues that Midland Funding is judicially estopped from relying on a "written agreement" to compel arbitration. R.

29, Resp. at 4–13. As for the second element, Russell maintains that even if there were a valid arbitration agreement, her claim falls outside the scope of the arbitration provision. *Id.* at 13–15. The Court addresses each argument in turn.

## A. Enforceable Arbitration Agreement

A court "must decide whether a contract exists before it decides whether to stay an action and order arbitration." *Janiga*, 615 F.3d at 742. As previously noted, the party seeking to compel arbitration has the burden of establishing an agreement to arbitrate. 9 U.S.C. § 4; *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). Relying on Harwood's statement that Plaintiff agreed to the terms of the Card Agreement by receiving, signing, or using her credit card, Defendants argue that the Card Agreement is a valid and enforceable agreement. Memo. Compel at 8–9. Therefore, Defendants conclude that Russell is bound by the Card Agreement's arbitration provision.

Russell counters that Defendants have not shown that an agreement to arbitrate exists between Midland Funding and Russell. Resp. She first disputes that Midland Funding is the proper assignee, arguing that Defendants have not properly established the chain of title for the assignment of the Card Agreement from Credit One to Midland Funding and raising other evidentiary challenges to Defendants' chain of title. *Id.* at 5–8. Next, Russell argues that Defendants are judicially estopped from asserting that a written agreement to arbitrate exists based on the inconsistency between the Rosenberger Affidavit attached to the State Court Complaint and the information in Defendants' motion. *Id.* at 8–13.

The Court starts with the threshold question of whether a valid arbitration agreement exists. This question is determined under principles of state law. *Janiga*, 615 F.3d at 742. Defendants suggest that Nevada law applies here,[4] because the choice-of-law provision in the agreement to arbitrate itself references the Nevada governing law provision in the Card Agreement. Memo. Compel at 8; Card Agreement at 4, 6. Russell does not contest the application of Nevada state law, does not offer another state's law as a viable option, and does not propose that the Court engage in a choice-of-law analysis to determine which state's law to apply. Therefore, the Court applies Nevada law. *See Credit One Bank, N.A.*, 885 F.3d at 1063 n.14.

Under Nevada law, an enforceable contract requires "an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005). "When examining the supposed 'intent' behind contractual words, what matters is not the subjective intention of the parties (i.e., what the parties may have thought in their minds), but rather the more objective inquiry into the meaning conveyed by the words they selected to define the scope of the agreement." *DeChambeau v. Balkenbush*, 431 P.3d 359, 362 (Nev. App. Ct. 2018). Additionally, under Nevada law, "[a]n agreement governing a credit card account is accepted when the card is used after receiving the agreement." *Merritt v. Credit One Bank, N.A.*, 2020 WL 5775749, at *1 (D. Nev. Sept. 28, 2020) (citing NEV. REV. STAT. § 97A.140

---

[4]Though, interestingly, Defendants also cite Illinois authority for support for the proposition that a cardholder is deemed to have accepted the terms and conditions provided by the issuer upon use of the credit card. Memo. Compel at 8.

("A cardholder shall be deemed to have accepted the written terms and conditions provided by the issuer upon subsequent actual use of the credit card")).[5]

Defendants maintain that Russell agreed to the terms of the Card Agreement by "receiving, signing or using" her credit card, and Russell admits that she used the Credit One credit card. Memo. Compel at 8.; Compl. ¶¶ 27–28. Accordingly, Russell assented to the Card Agreement and the provisions contained in the agreement, including the arbitration provision and class action waiver provision. The Court then, having determined the threshold existence of an arbitration agreement and a class waiver provision, turns to the issue in dispute—whether Midland Funding can enforce the arbitration agreement against Russell.

### i. Midland Funding's Status as Assignee

Defendants argue that the preamble of the Card Agreement reveals that it extends not only to Credit One, but to Credit One's successors and assigns. Memo. Compel at 11. Because Midland Funding has purchased all the rights, title, and interest in Russell's account, Defendants reason that Midland Funding is the successor to and assignee of Credit One under the Card Agreement. *Id.* While Defendants use both successor and assignee as their designation, their argument rests on Midland Funding's status as an assignee, and that is the designation the Court applies.

---

[5]Illinois law, the forum state law, is similar to Nevada law with respect to contract formation. An enforceable contract under Illinois law requires an offer, acceptance, consideration, and mutual assent. *Nat'l Prod. Workers Union Ins. Trust v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011); *see also Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016) ("Formation of a contract requires mutual assent in virtually all jurisdictions; Illinois courts use an objective approach to that question.").

Russell challenges Defendants' assertion that Midland Funding owns her credit card account and that it was assigned the right to arbitrate. Resp. at 5–8. She advances various evidentiary arguments, ultimately challenging the chain of title from Credit One to Midland Funding. *Id.* The Court finds that Midland Funding has adequately established the chain of title regarding assignment of the Card Agreement from Credit One to Midland Funding and evaluates each transaction below.

### a. Credit One Sale

Defendants maintain that on December 24, 2017, Russell's account balance was charged off, and that on December 31, 2017, Credit One sold, assigned, and conveyed all of its rights, title, and interest to Russell's account and associated receivable to MHC to collect on the Alleged Debt, citing the 2020 Harwood Affidavit. 2020 Harwood Affidavit ¶¶ 10–11. Russell challenges this transaction, contending that other than Harwood's statements that the pool of accounts and receivables sold to MHC included her account and receivable, Defendants provide no other evidence that her account and receivable was, in fact, included in the pool. Resp. at 5–6. She also questions what Credit One conveyed to MHC as part of these transactions. *Id.* at 6. The Court disagrees with her contentions.

Pursuant to Federal Rule of Civil Procedure 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge" and "set out facts that would be admissible in evidence." FED. R. CIV. PRO. 56(c)(4). *See Tinder*, 305 F.3d at 735 (the resisting party's evidentiary burden is like that of a party opposing summary judgment). A witness, under the Federal Rules of Evidence,

may only testify to matters of which he or she has personal knowledge. FED. R. EVID. 602. Harwood, in his 2020 affidavit, states that as the Vice President of Collections for Credit One, he is authorized to make his affidavit on behalf of Credit One. 2020 Harwood Affidavit ¶ 3. He also attests that the facts stated in his affidavit are within his personal knowledge and based on his review of relevant business records, including the ones attached to his affidavit. *Id.* ¶ 4. The Court is satisfied that Harwood has the requisite personal knowledge to make statements on behalf of Credit One.

The 2020 Harwood Affidavit rests primarily on Bills of Sales and other business records. *See* 2020 Harwood Affidavit. Although these exhibits constitute hearsay, Federal Rule of Evidence 803(6) allows the admissibility of business records as a hearsay exception. FED. R. EVID. 803(6). The exception applies if an affiant meets five conditions: "(1) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (2) the record was kept in the ordinary course of a regularly conducted activity of a business, organization, occupation, or calling; (3) making the record was a regular practice of that activity; (4) all these conditions are shown by the testimony of a custodian or another qualified witness; and (5) the opponent does not show that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness." *Torry v. City of Chi.*, 932 F.3d 579, 585 (7th Cir. 2019) (citing FED. R. EVID. 803(6)). Moreover, to authenticate a business record, "a qualified witness need not be in control of or have individual knowledge of the particular records; he need only be familiar with the

13

recordkeeping practices." *Id.* at 586 (quoting *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006) (internal quotations omitted)). Harwood, as a qualified witness of Credit One, makes the requisite statements in his affidavit to satisfy the conditions regarding the making and keeping of Credit One's business records. 2020 Harwood Affidavit ¶ 4. Russell does not show that the source of information or method of preparation displayed in his affidavit indicates a lack of trustworthiness. Therefore, with respect to the exhibits referencing Credit One, such exhibits satisfy the business records exception to the hearsay rule and are admissible.

The unrebutted evidence submitted by Defendants reveals that Credit One sold Russell's account and receivable to MHC. Pursuant to the first Bill of Sale attached as Exhibit E to the 2020 Harwood Affidavit, Credit One transferred, sold, assigned, conveyed, granted, and otherwise" delivered to [MHC] all of [Credit One's] right, title and interest to (i) the receivables … and (ii) ***all claims or rights arising out of or relating to each of those Receivables***." 2020 Harwood Affidavit, Exh. E, Bill of Sale and Assignment of Receivables (emphasis added). Pursuant to the second Bill of Sale attached as Exhibit E to the 2020 Harwood Affidavit, Credit One "has transferred, has sold, has assigned, has conveyed, has granted, and has otherwise delivered to [MHC] all of [Credit One's] right, title and interest to (i) the charged-off credit card accounts … and (iii) ***all claims or rights arising out of or relating to each of those account… including, but not limited to, all claims and rights afforded each Account by virtue of that Account's corresponding terms and***

14

*conditions.*" 2020 Harwood Affidavit, Exh. E, Bill of Sale and Assignment of Accounts (emphasis added).

Defendants have met their burden to establish Credit One sold Russell's account and receivable to MHC. As such, Russell's challenge to this assignment fails. Harwood, as the Vice President of Collections for Credit One, reviewed the relevant business records for Credit One and testifies that, based on his review, Russell's account and receivable was included in the assignment from Credit One to MHC. 2020 Harwood Affidavit ¶¶ 4, 10–11. Further, the Bills of Sale reveal what exactly was conveyed with respect to each account and receivable. "In construing the parties' intent, it is black letter law that if the language of the agreement is clear and unambiguous, the Court will [enforce] it as written." *Peterson v. Midland Funding, LLC*, 2020 WL 6719116, at *2 (N.D. Ill. Nov. 16, 2020) (citing *Washoe Cty. Sch. Dist. v. White*, 396 P.3d 834, 838 (Nev. 2017)). Both of the December 31, 2017 Bills of Sale contain clear and unambiguous language that MHC purchased the entirety of the pool of accounts and receivables, which includes Russell's account and receivable and any rights under the Card Agreement. *See Id.*

### b. MHC and FNBM Sales

Next, Defendants contend that on January 17, 2018, three transactions occurred which resulted in Russell's account and receivable ending up with Sherman Originator III, LLC (Sherman). First, they claim that Russell's account was sold by MHC to Sherman and cite to the 2020 Harwood Affidavit and an additional affidavit executed by Harwood in 2018 that is attached as Exhibit G to the 2020 Harwood

Affidavit (2018 Harwood Affidavit). 2020 Harwood Affidavit ¶ 12; R. 24-1 at 26–28, 2018 Harwood Affidavit ¶ 5. Second, they assert that Russell's receivable was sold by MHC to FNBM, citing to both Harwood Affidavits. 2020 Harwood Affidavit ¶ 13; 2018 Harwood Affidavit ¶ 4. Third, they claim that Russell's receivable was sold by FNBM to Sherman, again citing to both Harwood Affidavits. 2020 Harwood Affidavit ¶ 14; 2018 Harwood Affidavit ¶ 4.

Russell challenges these transactions on several bases: (i) she questions whether Russell's account was included in the successive pools of accounts and receivables (Resp. at 6); (ii) she contests what rights and interest FNBM and Sherman each held in the transferred receivables (*id.*); (iii) she contends that Harwood is authorized to make statements only on behalf of Credit One and MHC, not FNBM, and, therefore, there is a gap in the chain of title and a question of fact precluding the granting of Defendants' motion (*id.* at 6–7); and (iv) she argues that the 2020 Harwood Affidavit is "materially false and inconsistent," because even though he states that true and correct copies of the Bill of Sale is attached to his affidavit, the Bill of Sale omits a referenced data computer file or any data from that file (*id.*). Again, the Court disagrees with Russell's challenges here.

Before reviewing the specific documents Defendants rely upon with respect to MHC and FNBM, the Court evaluates whether such documents are admissible as evidence. In his 2020 affidavit, Harwood states that he is an authorized representative of MHC and FNBM but only that he is authorized to make his affidavit on behalf of Credit One and MHC. 2020 Harwood Affidavit ¶¶ 3–4. He attests that

the facts in his affidavit are within his personal knowledge and based on his review of the relevant business records of Credit One, MHC, and FNBM. *Id.* ¶ 4. In response to Russell's challenge of Harwood's ability to testify on behalf of FNBM, Defendants point out that Harwood attests that he is an authorized representative of not only Credit One, but also FNBM and MHC, and that he is authorized to testify on behalf of Credit One, MHC, and FNBM. R. 32, Reply at 3 n.2. They rely on both Harwood affidavits and the affidavit of Vicki Scott, another Vice President of Credit One, for support. Credit One, MHC, FNBM, and Sherman have a standing arrangement—(i) MHC and FNBM are both special purpose entities related to Credit One that provide monies to Credit One to fund receivables originated by Credit One (R. 24-2, Swaninger Declaration, CM/ECF 11–12, Scott Affidavit ¶ 9); (ii) each day, Credit One assigns all new credit card receivables originated by Credit One consumers to MHC, and then MHC assigns those to FNBM (*id.* ¶ 10); and (iii) pursuant to purchase agreements between FNBM and Sherman, Sherman then purchases outstanding receivables from FNBM once the corresponding accounts are charged off (*id.* ¶ 12).

Pursuant to the 2018 Harwood Affidavit, Harwood testifies that he is the authorized representative of Credit One, MHC, and FNBM and that he is authorized to make his affidavit on behalf of all three entities. 2018 Harwood Affidavit ¶ 1. He further states that the facts in his affidavit are within his personal knowledge and based on his review of the business records of Credit One, MHC, and FNBM. *Id.* ¶¶ 3–4. Accordingly, based on the fact that Credit One, MHC, and FNBM are part of the same corporate family; that Harwood has testified that he is authorized to make both

17

of his affidavits on behalf of Credit One and MHC and his 2018 affidavit on behalf of FNBM; and that he has reviewed the business records of all three entities, the Court finds that Harwood has the requisite personal knowledge to make statements on behalf of both MHC and FNBM. Further, the Court finds that Harwood has properly authenticated the business records attached to both his 2020 affidavit and his 2018 affidavit. Because Russell does not show that the source of information or method of preparation displayed in Harwood's affidavits indicate a lack of trustworthiness, the business records attached are admissible under the business records hearsay exception, pursuant to Federal Rule of Evidence 803(6).

Again, the Court finds that Defendants' unrebutted evidence shows that MHC sold Russell's account to Sherman, that MHC sold Russell's receivable to FNBM, and that FNBM sold Russell's receivable to Sherman. Pursuant to the Bill of Sale attached as Exhibit F to the 2020 Harwood Affidavit, MHC "hereby transfers, sells, assigns, conveys, grants and otherwise delivers to [Sherman] all of [MHC's] rights title and interest in and to (i) the charged-off accounts… and (iii) ***all claims or rights arising out of or relating to each referenced account… including, but not limited to, all claims and rights afforded each account by virtue of that account's corresponding terms and conditions***." 2020 Harwood Affidavit, Exh. F (emphasis added). Based on his review of the relevant business records, Harwood testifies that Russell's account was included in this sale. 2020 Harwood Affidavit ¶ 12.

18

On the same date, pursuant to the Bill of Sale attached as Exhibit G to the 2020 Harwood Affidavit, MHC "has periodically transferred, has sold, has assigned, has conveyed, has granted and has otherwise delivered to [FNBM] *all* of its rights, title and interest in and to (i) the receivables … and (ii) ***all claims or rights arising out of or relating to the account level receivables.***" 2020 Harwood Affidavit, Exh. G (emphasis added). Pursuant to the Bill of Sale attached as Exhibit H to the Harwood Affidavit, FNBM "hereby transfers, sells, assigns, conveys, grants and delivers to [Sherman] all of its rights, title and interest to (i) the receivables … and (ii) ***all claims or rights arising out of or relating to the receivables.***" 2020 Harwood Affidavit, Exh. H (emphasis added). Based on Harwood's review of the MHC and FNBM business records, both of these sales included the receivable associated with Russell's account. 2020 Harwood Affidavit ¶¶ 13–14; 2018 Harwood Affidavit ¶ 4.

The Court finds that Defendants have met their burden of establishing that MHC sold Russell's account to Sherman, and separately, that MHC sold Russell's receivable to FNBM, and FNBM then sold the receivable to Sherman. Russell's challenges do not rebut this burden. Russell's questioning of what rights and interest FNBM and Sherman held in her receivable ignores the plain language of the Bills of Sale, which contain clear and unambiguous language that the entirety of the receivables was purchased, including any rights under the Card Agreement. 2020 Harwood Affidavit, Exh. G; *Id.* Exh. H. Additionally, Russell's contention that the 2020 Harwood Affidavit is "materially false and inconsistent" has no merit. Resp. at

7. Besides Russell's failure to cite to any legal authority for her argument, Harwood attaches to his affidavit each of the Bills of Sales he references in his 2020 affidavit. *See* 2020 Harwood Affidavit, Exhs. E–H.

### c. Sherman Sale

Finally, Defendants assert that on January 26, 2018, Sherman sold Russell's account and receivable to Midland Funding, pursuant to a Purchase and Sale Agreement and Bill of Sale and Assignment. R. 24-2, Swaninger Declaration ¶ 8. Russell counters that Swaninger, a Midland employee, cannot authenticate Sherman's business records and that there is a factual question as to what rights were transferred pursuant to this sale. Resp. at 7–8. The Court once again finds that Russell's challenge has no merit.

Swaninger declares that he is a Manager of Operations for MCM (Swaninger Declaration ¶ 3), and that MCM is a servicer and corporate affiliate of Midland Funding (*id.* ¶ 2). He also states that he is authorized to make his affidavit on behalf of MCM and Midland Funding. *Id.* ¶ 1. Finally, he states that he makes his declaration based on his personal knowledge and his review of the business records of MCM and Midland Funding as the custodian of those records. *Id.* ¶ 3. The Court is satisfied that Swaninger has the requisite personal knowledge to make statements on behalf of Midland Funding and MCM.

Swaninger also makes the requisite statements in his declaration to satisfy the conditions regarding the making and keeping of Midland Funding's and MCM's business records. Swaninger Declaration ¶ 3–4. Russell does not show that the source

of information or method of preparation displayed in his declaration indicate a lack of trustworthiness. Therefore, with respect to the exhibits referencing Midland Funding and MCM, such exhibits satisfy the business records exception to the hearsay rule and are admissible.

Pursuant to the Bill of Sale of Accounts and Receivables attached as Exhibit A to the Swaninger Declaration, Sherman "does hereby sell, assign and transfer to [Midland Funding], it successors and assigns, ***all right, title and interest in and to the … accounts.***" Swaninger Declaration, Exh. A (emphasis added). Swaninger also states that he personally reviewed Sherman's business records and that Russell's account was included in the January 26, 2018 Midland Funding purchase of credit card accounts from Sherman. *Id.* ¶ 8.

Russell's contention that Swaninger cannot authenticate Sherman's business records is irrelevant. Swaninger does not need to authenticate Sherman's business records to establish chain of title—Midland Funding, not Sherman, is seeking to enforce rights under the Card Agreement associated with Russell's account. Furthermore, the clear and unambiguous language of the Bill of Sale shows that Sherman sold to Midland Funding *all* rights, and title, and interest in the accounts and receivables, and Russell's attempt to read ambiguity into this language fails. *See* Swaninger Declaration, Exh. A. As a result, the Court finds that Defendants' establishment of the chain of title survives Russell's challenges.

The Court finds that Midland Funding has adequately established the chain of title regarding assignment of the Card Agreement from Credit One to Midland

Funding, by providing business records and accompanying affidavits which properly authenticate such documents under Federal Rule of Evidence 803(6). *See Peterson*, 2020 WL 6719116, at \*2; *see also Fuller v. Frontline Asset Strategies LLC*, 2018 WL 1744674, at \*3 (N.D. Ill. Apr. 11, 2018).

As a result of each of these successive assignments, Midland Funding has stepped into the shoes of the Credit One and succeeds to all rights of Credit One, including the right to invoke the arbitration provision and the class action waiver provision in the Card Agreement. *See Interim Cap. LLC v. Herr Law Grp., Ltd.*, 2011 WL 7047062, at \*6 (D. Nev. Oct. 21, 2011) ("It is well established that an assignee 'stands in the shoes' of the assignor and succeeds to all rights of the assignor. The general rule of assignments is that the transferee has the same rights as the transferor."). Furthermore, the clear and unambiguous language of the Card Agreement states that the arbitration provision shall survive "any transfer or assignment of your account, or any amounts owed on your account, to any other person . . . ." Card Agreement at 7. Defendants have met their burden of establishing that a valid arbitration agreement exists and was validly assigned to Midland Funding. As a result, because Midland Funding is the assignee of Credit One, it acquired all of Credit One's rights under the Card Agreement, including the right to invoke and enforce the arbitration provision and the class action waiver.[6]

---

[6]The Court notes that Russell does not address the class action waiver separately in her Response. *See generally* Resp.

22

### ii. Russell's Best Evidence Argument

Russell makes one final broad stroke evidentiary argument—that Defendants have failed to provide any of the purchase agreements referenced in the Bills of Sale attached to Defendants' motion. Resp. at 4–5. Therefore, according to Russell, Defendants have violated the best-evidence rule by relying on documents to show the chain of title, but not providing the best-evidence of the same, i.e., the purchase agreements. *Id.*

The best evidence rule provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provide otherwise." FED. R. EVID. 1002. The Court agrees with Defendants that the substance of the purchase agreements is irrelevant to the issue of arbitrability. R. 32, Reply at 6. Russell's contention that Defendants have violated the best evidence rule is perplexing, because Defendants provided the Bills of Sales themselves, each of which indicate that they transfer ***all*** of the rights, title, and interest in the relevant accounts, receivables, or both. Russell does not make a viable argument as to why the purchase agreements themselves are necessary.

Russell references *Lillegard v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 2017 WL 1954545 (N.D. Ill. May 11, 2017) for the proposition that without having provided the purchase agreements, the Court cannot know what terms exist regarding Defendants' right to invoke arbitration, and therefore, Defendants cannot properly establish chain of title. Resp. at 4. Yet, as Defendants correctly point out, the bill of sale in that case only stated that the seller "does hereby transfer, sell,

assign, convey, grant, bargain, set over and deliver to Buyer, and to Buyer's successors and assigns, the Accounts described in Exhibit 1 and the final electronic file." Reply at 7 (citing *Lillegard*, 2017 WL 1954545 at *5). That bill of sale is devoid of the language present in the Bills of Sale here, which state that they "serve as evidence of ownership" and that "*all* rights, title and interest" were transferred. *Id.* (emphasis added).[7] The Court finds that Russell's best evidence challenge cannot overcome Defendants' chain of title.

### iii. Russell's Judicial Estoppel Arguments Against Assignment

Russell also makes two judicial estoppel arguments against Midland Funding's ability to enforce its rights under the Card Agreement, and the Court reviews each in turn.

First, Russell contends that Defendants are judicially estopped from taking a contrary position to the position they asserted in state court, because the chain of title in their motion does not match up with the Rosenberger Affidavit attached to the State Court Complaint. Resp. at 9–10. According to Russell, the Rosenberger Affidavit fails to mention FNBM. *Id.* Yet, Russell's argument ignores the distinction

---

[7]Defendants attempt to present new evidence in their Reply by attaching the Declaration of Kim Hannigan. R. 32-1. The Court may not rely on this evidence in reaching its decision without providing Russell an opportunity to respond. *See, e.g., Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 858 (7th Cir. 2015) ("Due process, we have cautioned, requires that a plaintiff be given an opportunity to respond to an argument or evidence raised as a basis to dismiss his or her claims."); *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990) ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond."); *Horvath v. Apria Healthcare, LLC*, 2019 WL 5725378, at *2 (N.D. Ill. Nov. 5, 2019) ("'A reply brief is for replying'—not for sandbagging." (quoting *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 360 (7th Cir. 1987))). Accordingly, the Court disregards this declaration.

in the chains of title. As Defendants note, the Rosenberger Affidavit concerns the successive assignments of the accounts only. Reply at 8. It does not address receivables. The Court does not find any inconsistencies between the chain of title of accounts presented in the Rosenberger Affidavit and the affidavits attached to Defendants' motions in this case, both of which show that the accounts transferred in the following order: (i) Credit One; (ii) MHC; (iii) Sherman; and (iv) Midland Funding. State Court Complaint; 2020 Harwood Affidavit; Swaninger Declaration.

Second, Russell argues that Midland Funding is judicially estopped from relying on a written agreement to compel arbitration, when the Rosenberger Affidavit, which states that the "the court case is based on an unwritten contract," is attached to the State Court Complaint. Resp. at 10–13. Defendants retort that the State Court Complaint is brought under multiple alternative theories as permitted under Illinois law, including breach of contract, implied contract/unjust enrichment, and account stated. Reply at 9. Further, they contend that they used a form affidavit in the State Court Complaint, which required them to indicate that an account statement was attached as an exhibit to the complaint. *Id.* at 10. As the court stated in *Peterson*, "[j]udicial estoppel is designed to prevent parties from obtaining an unfair advantage by taking a present position that is inconsistent with one successfully taken in the past." 2020 WL 6719116, at *3 (quoting *Massuda v. Panda Exp., Inc.*, 759 F.3d 779, 783 (7th Cir. 2014)). Midland Funding's assertion in both lawsuits "is not inconsistent because under Illinois law, a credit card agreement constitutes an 'unwritten contract,' even if there is a credit card agreement with

25

terms and conditions." *Id.* (citing *CACH, LLC v. Moore*, 133 N.E.3d 661, 664 (Ill. App. Ct. 2019)). The Court finds, as in *Peterson*, that Russell's judicial estoppel argument is misplaced.

In sum, the Court finds that there is a valid arbitration agreement. Once the court finds that there is a valid agreement to arbitrate, the burden shifts to the party opposing arbitration to show that the dispute is not covered by the agreement. *Hoenig v. Karl Knauz Motors, Inc.*, 983 F. Supp. 2d 952, 962 (N.D. Ill. 2013) (citing *Shearson/Am. Express, Inc., McMahon*, 482 U.S. 220, 226–27 (1987)). The Court, then, next addresses whether the dispute is covered by the arbitration agreement.

### B. Scope of Arbitration Provision

Defendants assert that the arbitration provision contains a broad definition of "claims," which includes claims based on any theory of law including any statute, such as the FDCPA. Memo. Compel at 9–10. Defendants contend that because the plain language of the Card Agreement encompasses Russell's FDCPA claim, her claims fall "squarely within the category of claims that relate to [Russell's account] and thus, must be arbitrated." *Id.* at 10.

Russell disagrees, contending that because Credit One is not a debt collector as such term is defined by the FDCPA, the arbitration provision only applies to Credit One based on its status as a creditor. Resp. at 13–15.[8] Yet, the plain and unambiguous language of the Card Agreement does not set such a limitation. Pursuant to the

---

[8]Russell also notes that Defendants argue that the claims of the state court lawsuit must necessarily be covered under the arbitration provision (Resp. at 14), but this incorrectly summarizes Defendants' position.

preamble of the Card Agreement, the words "we," "us," "our," and "Credit One Bank," "refer to Credit One Bank, N.A., its successors or *assigns*." Card Agreement at 4 (emphasis added). This means that the Card Agreement applies to Midland Funding, as an assignee of Credit One. The Card Agreement does not limit the definition or application of these terms. The arbitration provision also states that claims subject to arbitration include claims "that relate directly to us, a parent company, affiliated company, and any predecessors and successors (and the employees, officers and directors of all of these entities), but also Claims for which we may be directly or indirectly liable, even if we are not properly named at the time the Claim is made." *Id.* at 6. Furthermore, it also includes "[c]laims based on any theory of law, any contract, statute, regulation, ordinance, tort (including fraud or any intentional tort), common law, constitutional provision, respondeat superior, agency or other doctrine concerning liability for other persons, custom or course of dealing or any other legal or equitable ground." *Id.* Finally, the arbitration provision covers "any other matters relating to your account." *Id.* Defendants accurately assert that arbitration clauses with "arising out of or relating to" language are broad and create a "presumption of arbitrability." Memo. Compel at 10 (citing *Keifer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 910 (7th Cir. 1999)). Russell has not met her burden to show that the arbitration provision does not cover her claim, and the Court agrees that Russell's claim falls within the scope of the arbitration provision as it relates to her account. *See Ramirez v. Midland Funding, LLC*, 2019 WL 2568478, at *4 (N.D. Ill. June 21, 2019); *see also Hauptman v. Midland Credit Mgmt.*, 2019 WL 8436961, at *2 (N.D.

Ill. Jan. 31, 2019). While Russell does not address the class waiver provision in her Response, the Court finds that the class waiver provision also applies to her claim.

## C. Enforcement of Arbitration Provision

The Court has determined that *Midland Funding* may enforce the arbitration provision of the Card Agreement. Yet, the remaining Defendants are not parties to the Card Agreement. Defendants first contend that the plain language of the arbitration provision itself extends to any parent company and affiliated company of Midland Funding, which includes MCM, Encore, and Kohn. Memo. Compel at 12. Defendants maintain that an amalgamation of numerous state law principles, including equitable estoppel, agency, and third-party beneficiary status, also apply. *Id.* at 12–14. They primarily focus on equitable estoppel, asserting that it applies because under Nevada law, Russell, who is a signatory to the Card Agreement, alleged "substantially interdependent and concerted conduct by both a signatory [Midland Funding] and non-signatories (MCM, Encore, and Kohn)." Memo. Compel at 12.

Russell fails to address these arguments let alone rebut them in her Response. *See generally* Resp. Russell's silence on this point can only be construed as a concession that all Defendants can enforce the arbitration provision. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.") Therefore, the Court finds that Russell concedes this point.

Nonetheless, the Court finds that the plain and unambiguous language of the arbitration provision allows MCM, Encore, and Kohn to invoke it. *See Washoe Cty.*

28

*Sch. Dist.*, 396 P.3d at 838. The arbitration provision states that claims subject to arbitration include claims "that relate directly to us, a parent company, affiliated company, and any predecessors and successors (and the employees, officers and directors of all of these entities), but also Claims for which we may be directly or indirectly liable, even if we are not properly named at the time the Claim is made." Card Agreement at 6. This covers MCM and Encore because they are corporate affiliates of Midland Funding. Defendants also claim that Kohn is an agent of Midland Funding and should be entitled to compel arbitration "because the claims provision broadly includes claims for which [Midland Funding] could be directly or indirectly liable." Memo. Compel. at 12, n.1. The Court agrees.

## Conclusion

For the reasons set forth above, the Court grants Defendants' Motion to Compel Arbitration [23], and orders Russell to pursue her claim via arbitration before an arbitration administrator as specified in the arbitration provision of the Card Agreement. This civil case is terminated.

Dated: March 30, 2021

_____
United States District Judge
Franklin U. Valderrama

29